The plaintiffs in this case who are the owners of a 480 acre farm situated near the Iowa Oil Field in Calcasieu Parish and which they had rented to a party by *Page 758 
the name of Levander LeBleu, have instituted this suit against Shell Oil Company, Inc., to recover the sum of $1,500 for the loss of part of the rent which they claim they would have received under the contract of lease but for the damage to the soil by salt water which overflowed the land as a result of the operations of oil and gas wells by the defendant company, making it impossible for their tenant to plant a crop for the year 1944-45.
In their petition, after alleging their ownership of the land and that it was good agricultural land particularly suitable for the cultivation of rice, they aver that defendant owns a salt water tank or pit which is located on the Hyde property immediately north of theirs; that the pit was constructed for the purpose of confining and taking care of salt water from oil and gas wells operated by it in the Iowa Oil Field and that on or about February 1, 1944, and afterwards, the defendant permitted salt water from its wells to escape from the said pit and to flow over their land in sufficient quantities to cause the damage which they complain of. They allege that the damage resulted solely from the defendant's acts of negligence in failing to properly confine or take care of the salt water from its wells in such manner as to prevent it from flowing over adjoining lands.
Their claim for damages is based on the following grounds: (1) that their land was rendered unfit for rice cultivation in the year 1944; (2) that they were made of such doubtful value for the year 1945 that no prudent rice farmer would undertake to cultivate them, and (3) that the value of their lands was affected for grazing purposes for both years 1944 and 1945. In specifying the amount of damage they suffered they simply allege that the rental of the said lands for the year 1944-45 has been reduced by more than $1,500.
For answer the defendant company admits generally the situation set out in the plaintiffs' petition about the location of the land and of the salt water pit constructed by it on the adjoining land to the north but it denies each and every other allegation and, further answering, avers that in the operation of its oil activities in the vicinity, all salt water produced on lands under lease to it was disposed of by returning it to the sub-surface through salt water disposal wells, in conformity with regulations and under the supervision of the Conservation Department of the State of Louisiana. It denies particularly that on or about February 1, 1944 it permitted any salt water to escape and flow upon the land described in the plaintiffs' petition.
In the lower court, after trial, there was judgment in favor of the defendant and against the plaintiffs rejecting their demand and they have appealed. The trial judge assigned written reasons in which he held that there was sufficient evidence to show that a part of the plaintiffs' land at least had been damaged but that the testimony was not sufficient to show that such damage was caused through any acts of negligence of the defendant in having failed to control the salt water in its pit on the Hyde property, nor did the testimony show that there had been a break in the levee surrounding the pit, as contended by the plaintiffs and from which the salt water escaped and flowed over their land. The trial judge seems to have agreed with the contention of the defendant that whatever damage had been caused to the land was most probably produced by the overflow of salt water from a salt water pit of another oil company further north than the defendant's pit.
It is not difficult for us to agree with the trial judge that the proof shows that there was an excess deposit of salt water on some part of the land of the plaintiffs but the close and important question in the case is whether they have sustained the burden of proving that any of that damage was caused through any act of the defendant company in not properly taking care of the salt water from its wells or pit. Even though the contention made by the defendant through its witness, Mr. Boyd Faulk, that salt damage to the property was caused by the flow of water which he traced from what he calls a crevasse in the pit of another oil company, would be correct, if the plaintiffs have shown that *Page 759 
any part or section of their property sustained salt damage from the defendant company's salt water, they should be entitled to recover, provided, of course, they have sufficiently proven any of the damage they claim.
In considering the testimony of the various witnesses in the case, it is very helpful, as suggested by counsel on both sides, that we have the two maps or sketches introduced in evidence before us, particularly the one introduced by plaintiff and marked "P-2" which is not quite as complicated as the large map introduced by defendant and marked "D-1".
Looking at the may "P-2" which counsel for defendant themselves rely on to show that it is impossible for water emanating from the defendant's pit on the Hyde property to have damaged those portions of the land which are pointed out by the expert witness for plaintiffs, Dr. W.J. Peevy, professor of agronomy at Louisiana State University, as being those portions damaged beyond use for rice cultivation, we might agree with them as far as those portions marked off as "1, 2, 3, 4, 5, and C" are concerned but according to Dr. Peevy it would seem that the section marked "B" was also damaged to some extent. He did not find the area marked "A" to be damaged nor the area marked "No. 6". With regard to the area marked "B" he says that plants were dead and there was salt incrustation in some part of that area. Conceding then that the defendant may be correct in urging that the salt water came on most of the property through the large drainage ditch which runs northeast to southwest along the eastern edge, and the overflow from that canal, we cannot agree that the overflow extended as far northwest of that canal as to lay such a deposit of salt as was found by Dr. Peevy in some sections of the area marked "B". Mr. Frank Tuten, one of the owners of the property, and Mr. LeBleu, the tenant, both testified that that portion of the property is higher than the rest and their contention is that the damage did not cover that whole area as well as part of the area "A" was because of the elevation.
On the other hand it is hard to get around the fact that there is a drainage ditch at the point marked "F" immediately south of the defendant's. Hyde pit and running directly north and south right through that area of the land marked "B". It is further shown that that portion of the Hyde property which is immediately north of the area "B" also had a salt deposit on it. It would be as reasonable to assume therefore that there could have been an overflow of salt water in that ditch as it is to assume, which after all is all that we can do, that there was an overflow of salt water in the large drainage canal that came from another pit belonging to some other oil company in that area.
Defendant's witness Mr. Faulk who tried to explain how the damage might have occurred in the lower area of the property from an overflow of water in the canal has no suggestion to offer as to why the area marked "B" should have been damaged by salt water other than from the Hyde pit and he frankly admits that that area had been overflowed by salt water.
This all leads to the conclusion that whilst the district judge may have been correct in holding that plaintiffs had not shown that their property had been damaged in those portions marked on the map as 1, 2, 3, 4, 5 and C by salt water flowing from defendant's Hyde pit, he evidently was wrong with regard to the area marked "B".
[1, 2] An important question is what kind of proof is necessary in a case of this kind. There is a suggestion that the doctrine of res ipsa loquitur might apply but we doubt that and the point is not urged in brief. When we come to speculation, it seems to us that there is as good reason to speculate on one side as on the other and we do not get anywhere by indulging in that method of reasoning because it does not constitute proof. Counsel for plaintiffs point to the rule of evidence that a fact may be established by circumstantial as well as by direct and positive proof and cite in support the cases of Lemann Co. v. Texas Pacific Railway,128 La. 1089, 55 So. 684, and Wright v. Petty, 7 La. App. *Page 760 
584. The first of these cases involved a demand for damages caused by fire alleged to have been set by flying sparks from a train locomotive and the second, the accidental shooting of one boy by another. The rule of evidence referred to seems to have been applied in both cases and should be applied in this case, especially with regard to the area marked "B" where, to the exclusion of every other reasonable hypothesis, the damage would appear to have been caused by the overflow of salt water emanating from the defendant's salt water pit on the Hyde property.
[3] There is another important point in the case however on which we feel that the plaintiffs have not been able to satisfy the court to obtain a judgment in their favor at this time and that is with regard to the damage which they claim. It may be correct that a landlord who suffers damage because the property which he has leased or rented has been made unfit for use by the acts of other parties and the measure of his damage would be the loss of the amount of rent he would have received. We believe however that to support such loss he would be required to produce more positive proof than has been adduced in this case. There is not sufficient testimony to show what these particular lands have yielded in rice before and the proof further is that some of the property which the tenant condemned as unfit for cultivation might have been planted and made to yield some crop at least. Moreover, should we conclude that a part of the land was damaged by the operation of some other oil company and only a part of the area marked "B" damaged by the operation of the defendant company, there is no proof on which we could show the extent of the damage in the area "B" as compared to the other. Plaintiffs have lumped their damage in one sum and according to their allegation it included as a part, the loss of use of their land for grazing purposes as well as for rice cultivation. What proportion of the amount demanded is for either part of the claim, it is impossible to say as there is no proof on that point whatsoever.
Conceding therefore that plaintiffs have sustained some damage to their property through the operation of the defendant company, in the present state of the record, as we view it, there is no basis on which to assess any definite amount. In the interest of justice we have concluded that instead of a dismissal, they are entitled to a judgment of nonsuit, and it is therefore so ordered.