164 So.2d 276

**TOWN OF SLIDELL, Louisiana, and Sewerage District No. I–A of the Town of Slidell, Louisiana**

v.

**Hollis R. TEMPLE, t/a Temple Construction Company, and United States Fidelity & Guaranty Company.**

No. 46890.

May 4, 1964.

Rehearing Denied June 8, 1964.

---

David E. Cooley, Slidell, for plaintiffs-appellees-applicants.

William J. Jones, Jr., Covington, for defendants-appellants-respondents.

SUMMERS, Justice.

Suit on a contract was brought by the town of Slidell and its sewerage district as plaintiffs, against the contractor Hollis R. Temple, t/a Temple Construction Company, and his surety as defendants, for the expense incurred by the plaintiffs in repairing a failure, or breakdown, of a sewerage pipeline constructed for plaintiffs by the defendant contractor. There was judgment for plaintiffs in the trial court. On appeal the judgment was reversed. We granted certiorari.

The contract in question called for the construction of a sewerage disposal line in the city of Slidell. That portion of the line involved here runs generally in a north-south direction. It is a gravity flow line with the downflow to the north.

In the course of the construction, the contractor encountered water-bearing sand at a location on Highway 11 near its intersection with Kostmayer Avenue. In order to provide a firm base for the fifteen-inch vitrified clay pipe being installed at a depth of about ten feet, the contractor dug well points to dewater the sand. When the foundation was thoroughly dry the line was laid and the necessary indentations were dug to accommodate the protruding bell joints of the pipe. What this means is that each section of the pipe was fashioned on one end in a bell shape to accommodate the end of the other section and thereby provide a continuous unbroken barrel within the pipe, and, at the same time the bell-shaped end of the pipe permitted firm jointing of the pipe. The indentations for the bell joints enabled the pipe to maintain complete contact with the sandy foundation along its entire length.

The pipe joints were required to be sealed first by compressing a length of fiber called oakum within the bell joint and thereafter by pouring a hot asphalt mixture

into the joint to complete the seal. This was done but unfortunately the evidence does not disclose whether the joints in question were inspected, or whether an inspection would necessarily disclose all faults in such a seal.

The trench in which the pipe was installed was then backfilled and tamped. The line was put into service in October 1959, and a prior existing eight-inch subdivision line was tied into the system at a manhold upflow and just south of the point in question.

The line was formally accepted by the town in April 1960.

In December 1960, about fourteen months after the line was in use, a sinking of the surface soil was noticed at the point of eventual failure.

About five weeks later the line collapsed and failed completely. Defendants, the contractor and his surety, were promptly notified, but failed to take any action.

Meanwhile, the town was compelled to pump raw sewerage into open ditches, but, due to the health menace involved in this procedure, and the refusal of defendants to take any action, it was necessary to employ another contractor, C. C. Ouder, to excavate at the point of failure and to expedite the necessary repairs.

This excavation disclosed that about five sections or lengths of pipe had settled or sunk to a maximum depth of about eighteen inches. The pipe was not crushed; it remained intact except for one or two joints where the bell had broken on its upper circumference. There was cavitation in the sand surrounding the pipe at the point of failure.

The pipe to the south (upflow) of the point of failure was clear of sand, as was the manhole into which the existing eight-inch line had been connected, but to the north (downflow) from the failure the pipe contained a heavy deposit of sand for a considerable distance.

In his effort to remedy the situation, Ouder worked for several days with cable and tractor to free the line of sand. He was unsuccessful and the town engaged the service of the Roto-Rooter Company for this phase of the work.

Eventually, the repairs were completed and paid for by the town, the total actual costs being $5,199.53.

Only one question is presented, and that is a question of fact: What caused the sewer line to fail? The plaintiffs contend that the failure was due to one thing—a defective or imperfectly sealed joint. The defendants, on the other hand, contend that the failure of the pipe was due to one or all of several causes—inadequate contract specifications in that they did not provide for reinforcing the foundation in the water-bearing sand strata and this deficien-

cy caused the collapse of the line; or heavy rainfalls caused the failure; or the pipe specified for the project was not of sufficient strength; or sand from the eight-inch line accumulated in the line blocking the flow and the weight of the sand, together with the presure caused by the blocked liquid in the line, caused the line to fail or "blow out".

The trial court resolved the issue in plaintiffs' favor finding that the pipes were imperfectly sealed, permitting sand seepage into the pipe through a leak in the joint. This flow of sand into the pipe from the water-bearing sand foundation, the court found, brought about cavitation which undermined the pipe's foundation resulting in settling and the failure of the system at that location.

The court of appeal, after reviewing the evidence, concluded that plaintiffs must "establish his cause by a fair preponderance of the evidence", and, finding that it was not established by a fair preponderance of the evidence that the failure in the sewerage line resulted from a defective joint, plaintiffs' demands were rejected.

The law of Louisiana requires plaintiffs to make out their case by a fair preponderance of the evidence. Iennusa v. Rosato, 207 La. 999, 22 So.2d 467 (1945); Perez v. Meraux, 201 La. 498, 9 So.2d 662

(1942). By a preponderance of evidence is meant, simply, evidence which is of greater weight, or more convincing, than that which is offered in opposition to it. Coltharp v. Hearin Tank Lines, Inc., 239 La. 445, 118 So.2d 881 (1960); Edwards v. Shreveport Creosoting Co., Inc., 207 La. 699, 21 So.2d 878 (1945); 32 C.J.S. Evidence § 1021. It would appear unnecessary to mention that a fact may be established by circumstantial as well as by direct and positive proof. Lemann Co., Ltd., v. Texas & Pacific Railway, 128 La. 1089, 55 So. 684 (1911); Tuten v. Shell Oil Co., La.App., 26 So.2d 757 (1946); 4 La.L.Rev. 70 (1941); cf. Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963); Perkins v. Texas and New Orleans Railroad Company, 243 La. 829, 147 So.2d 646 (1962).

In the trial of civil cases, therefore, the concern is not for proof beyond a reasonable doubt but, rather, the requirement of proof may be satisfied with a preponderance of probabilities reasonably to be inferred from physical facts clearly established. Pohl v. American Bridge Division, U.S. Steel Corp., La.App. 109 So.2d 823 (1959).

It should be remembered, too, that where a trial court has made a finding of fact its judgment will not be upset on appeal unless deemed manifestly erroneous by the appellate court. This is a venerable

rule of law in Louisiana.[1] cf. Gaspard v. Le Maire, 245 La. 239, 158 So.2d 149 (1963). It has even been said that where irreconcilable facts are presented "an appellate court will not reverse the judgment of the trial court, if the evidence of the successful party, when considered by itself, is sufficient to sustain the judgment." Rhodes v. Sinclair Refining Co., 195 La. 842, 197 So. 575 (1940).

This court is of the opinion that plaintiffs have discharged the burden of proof imposed upon them by law.

From the beginning of the trial it was apparent that there was no positive evidence to establish the cause of the sewerage line failure. That is, no one saw the pipe break. But the evidence which was produced led clearly to the inference that the break in the line was due to a deterioration in the foundation which supported it. This was true because there was no evidence of a crushing of the pipe from above. And the cavitation around the point of failure in the line, together with the break in the upper circumference of the bell joint, pointed to the deteriorated foundation as the cause of the settling of the line, the resulting breaking of the pipe and filling of the line with sand.

The serious question presented was whether the foundation failed because the plans and specifications did not provide for its reinforcement, or whether the foundation failed because of faulty sealing of the pipe joint. In the former instance, the lack of proper plans and specifications would relieve the contractor of responsibility, whereas, in the latter instance faulty sealing of the pipe joint would place the responsibility for the failure squarely upon the contractor.

It is true that the contract did not provide for the reinforcement of the pipe foundation in water-bearing sands. And, at the same time, the facts do not indicate that such was necessary. All of the witnesses testified that the foundation area

1. In 21 La.L.Rev. 402 (1961) we find the following: "The vast majority of cases involving factual problems on appeal contain statements attesting to the universal applicability of the manifest error rule. The Louisiana Digest lists upwards of 1000 manifest error cases. In Succession of Fields, 222 La. 310, 319, 62 So. 2d 495, 498 (1952), the court stated: 'Counsel for defendant makes reference to 500 cases or more to the effect that a judgment of the trial court on questions of fact will not be disturbed on appeal unless manifestly erroneous.' In The Work of the Louisiana Supreme Court for the 1946-47 Term—Civil Procedure, 8 Louisiana Law Review 261, 268 (1948), it was stated: 'The settled rule that the trial court's findings of fact will not be disturbed on appeal unless deemed manifestly erroneous received its annual application in three of the decisions of the supreme court.'" See also Tate, "Manifest Error"—Further Observations on Appellate Review of Facts in Louisiana Civil Cases, 22 La.L.Rev. 605 (1962); Contra, Hardy, The Manifest Error Rule, 21 La.L.Rev. 749 (1961).

in the water-bearing sand was penetrated by several well points and thoroughly dewatered before installing the pipe. This, it was shown, is the accepted procedure under such circumstances. This procedure having been followed, the pipe was laid on a firm and proper foundation. It was then covered and tamped. This left the pipe in a condition where it could not shift, for it was firmly enclosed in the trench.

The only way the foundation could fail in such a situation was for the water-bearing sand which composed it to find an exit from its enclosure. And by seeping into that exit bring about a cavitation around the pipe; the pipe would then settle, break and fill with sand. Having found that this exit was not initially obtained through the broken pipe, because the pipe itself remained intact (except for the breaks at the upper circumference of the bell joints, which were caused by the settling of the pipe) it must be inferred that the sand found an exit otherwise. Because the sand was shown to have escaped into the pipe (as evidenced by the deposits of sand found there), the only plausible explanation for this was a leak in the pipe joint. It was not shown to have escaped elsewhere.[2] We think this is the highly probable explanation because the defendants' theory that the pipe was crushed due to its weakness and the weight above it was thoroughly disproved.[3] Likewise without merit is defendants' theory that the sand came from a leak in the prior eight-inch line that had been connected upflow from the point of failure and which was not part of the project contracted for. Under this theory defendants contend that the sand from a leak in the eight-inch line settled near the point of failure adding its weight and blocking the flow of liquids. This combination of the weight of the sand and the pressure of the entrapped liquid, they argue, broke the pipe. But this theory is not supported by the proof. To begin with, there was no accumulation of sand between the eight-inch line connection and the point of failure. All of the accumulated sand was lodged downflow from the point of failure, demonstrating unmistakably that the sand originated from the point of failure and not from the prior eight-inch line upflow from that point.

2. Although defendant produced witnesses who testified that the joints were all caulked and poured according to the accepted method, it does not result that a faulty operation would not produce a leaky joint. To the contrary, there is evidence that leaky joints had occurred before in Slidell under similar conditions. Nor is the evidence clear as to whether the particular joints involved were inspected by the town's inspector. In any event such an inspection would not relieve defendant from performing in a thorough and workmanlike manner under the contract in question.

3. The evidence on this point was supplied by C. C. Ouder, the contractor, who excavated the pipe and found it intact.

The other defense that the failure was caused by excessive rainfall is refuted by the evidence which shows there was no excessive rainfall in Slidell at or just prior to the time of the break. Furthermore, it should be observed that no trouble attributable to heavy rainfall developed at any other point on the line.

Then, there is the general inference which so naturally arises in such cases and which permeates these entire proceedings. It is the idea that something is wrong when a project designed as a permanent installation fails in such a short time. It is the thought that the owner has not received what he bargained for. In this case either because the plans and specifications were wanting or because there was faulty workmanship involved.

When plaintiff established that there was no deficiency in the plans and specifications, the inference then is that faulty workmanship was involved.

 All of the foregoing facts and the reasonable inferences to be gained from them furnish adequate evidence upon which the trial judge could base a fair conclusion that the failure was due to a leaky joint caused by faulty workmanship. The evidence to the contrary consists of defendants' numerous theories of how the failure could have occurred—all involving causes for which he was not responsible. None of those theories are supported by the evi-

dence, however, and they do little to lessen the strength of plaintiffs' case. There was, therefore, no manifest error in the finding of fact by the trial court.

For the reasons assigned, the judgment of the court of appeal is reversed and set aside and the judgment of the trial court is reinstated and made the judgment of this court.

HAMITER, J., concurs in the result.

McCALEB, J., concurs in the decree.

164 So.2d 280